Good morning, Your Honors. Meredith Fond for Appellant and habeas corpus petitioner Jeff Alsborg. I request to reserve a minute or two for rebuttal, please. May it please the Court. This Court should reach reversal of the District Court's decision and order the petition granted with or without edpedeference. I would argue that it's appropriate to find for Alsborg on the IAC claim under a de novo standard with no edpedeference, and I'd like to talk about how we reach that, how we get there of having no edpedeference, but also, and perhaps even more profoundly, this case falls squarely under Wiggins in that it involves a contrary, not contrary, an unreasonable application of Strickland under 2254 D-1, as well as an unreasonable adjudication of fact under 2254 D-2. In fact, multiple unreasonable adjudications of fact under D-2. So, I would argue that either way, in the alternative, this case points to reversal. You know, I have one problem and two parts to the problem. One is probably, for psychological reasons, I have forgotten for the moment the name of the case, but it's a most unfortunate habeas case in which I was reversed, but it's the case with the blood spatter in which ineffective assistance of counsel who didn't even bother to check with anybody, with any expert, and who knew nothing about the subject of blood spatter, and who the was entitled just to rely on his self-confidence that he would be able in cross-examination to do a better job for his client than it would if he even called an expert to ask how you demonstrate the existence of blood spatter evidence and whether it might help. Do you recall that case? Was it Penholster, Your Honor? No, it's not. I was on Bonk and I was on it too. Was it Harrington v. Richter? Yes. That's probably it. Harrington v. Richter. Yeah. Now, can you tell me how we can distinguish... The way Your Honor authored the Ninth Circuit version of this. Yes. Can you tell me how we can... Yes. distinguish that unfortunate case from yours? Many ways, Your Honor. First of all, going directly to the issue, the pinpoint issue of where Richter... I don't know if we want to call it Harrington or Richter. You call it whatever you want. Okay. Well, the pinpoint issue that Your Honor has brought up about finding that trial counsel was allowed to rely on his own opinions. Okay. This case, our case, is distinguishable because we have a situation where trial counsel, where we have our expert declarations show that trial counsel's incompetence. But also, Dr. Sicaria specifically told counsel DeBlanc that he needed to consult with a forensic pathologist. And some of DeBlanc's most crucial errors came from relying on Sicaria's own report, Sicaria not being a forensic pathologist. Well, what the court said in Richter was that as a matter of trial tactics, a lawyer can... I mean, I'm not sure if that's the right word, but a lawyer can I wouldn't want to hire this lawyer, but that a lawyer could, as a matter of trial tactics, think it's better not to present an expert, whatever he may say, and that it's better for the lawyer to try to impeach the state's expert by cross-examination, that that's an acceptable trial tactic and doesn't show ineffectiveness. Here, trial counsel was not relying exclusively or necessarily even primarily on his own experience. That is certainly part of what he... So he was more prepared than most on cross-examination because he had already conferred and figured out that he could get everything he needed to establish his alternative defense through the state's expert. That certainly wouldn't be a Wiggins violation. Well, no, because... The strategic decision. Well, the state's expert is not a neutral witness. So, and the distinction here is trial counsel DeBlanc was specifically advised to consult independently with a forensic psychologist... He had an expert who gave him incorrect advice that torpedoed... That was one of the reasons he made a strategic decision not to call his own expert because that doctor had miscalculated the blood alcohol. Exactly. And even... And that doctor told DeBlanc, Dr. Sicaria told DeBlanc, well, yes, you have my report, but I am not a forensic pathologist. You need to consult with a forensic pathologist. Did DeBlanc do that? No, he did not. Instead, he relied on Sicaria's erroneous report right after Sicaria himself had gotten done telling him, no, you need to consult with a forensic pathologist, which is not what I am. Sicaria even referred him to a specific forensic pathologist, Dr. Noguchi. And in the hearing on the new trial motion, DeBlanc emphasized, oh, he investigated, he consulted, he consulted with Sicaria. But you see, it was in the extra record evidence subsequent to that, that we get the declaration from Dr. Sicaria saying, he consulted with me. What consultation? It was not a meaningful consultation. It was a brief telephone call in which I told him that he needs to consult with a forensic pathologist like Dr. Noguchi. But he got his alternative theory of causation of the death before the jury through the state's expert, which is a strategy. I mean, some lawyers might think that's more persuasive than hiring your own hired gun. You get it through the state's witness. So I guess I want to know, why isn't that a classic strategic decision? Because the state's expert was directly wrong with his testimony on a key forensic issue that should have been clarified and impeached, but wasn't. Which issue was that? And that issue was, how does head rush sex occur versus deadly strangulation asphyxiation? And that has to do with the mechanics of the blood carrying the oxygen going to or from the brain, and how that also manifests in the form of petechiae. The specific pages in the record, in the excerpts of record, where Karn or Pena testified flat out wrong on that are EOR 419 and EOR 518. On both those pages, Karn or Pena completely got the wires crossed and confused them. Why wouldn't that be harmless error in light of the fact that your client repeatedly, for many months, and certainly right after the death, never indicated he had had sex with the decedent? And that came much later once they understood the state's case. You don't disagree with that, do you? Yes, Your Honor. My client did not deny. Very early on, when his first attorney, Dougherty, first was on the scene, who was a friend, the client was a little squirrely talking about that he had sex. Remember, this was a long time ago in terms of how open we might feel comfortable to be about same-sex relationships. The decedent, Alex Campbell himself, was largely closeted. His own stepdaughter didn't even know that he was gay or bi or had a live-in boyfriend who was my client, Jeff Alsburg. Suppose the case had been Jane and Alex rather than Jeff and Alex. Well, maybe there wouldn't even be a case, Your Honor. That's what I think. I mean, Gavin Newsom, Mayor Newsom in San Francisco hadn't even issued same-sex marriage licenses for a few years yet until long after this conviction was final under state law. People were squirrelish and squeamish about it. Even the way trial counsel talked about it in trial was squirrelly squeamish. You can't blame – it's understandable that Jeff himself very early on, particularly before he even realized that he was going to be a suspect, might not want to speak so freely and openly about, oh, yeah, we were having head rush sex and I put my semen in his rectum that night. Well, let me ask you about the semen in the rectum. That was interesting, too. As I understand it, the forensic expert testified that it could have been as much as 31 hours prior to his death that the semen was in his rectum. Theoretically, yes. And I don't recall seeing that there was any DNA evidence indicating that the semen in the decedent's rectum is tied to your client. Correct, Your Honor, because there is no reasonable plausibility as to anywhere else the semen could have come from. Alex Campbell – I don't think that would be a reason not to have DNA evidence to link it, but there wasn't any DNA evidence. No, there wasn't, Your Honor. And, you know, maybe on a retrial there ought to be, but there wasn't. Unfortunately, I don't have the transcript here, but it seemed to me they did a pretty good job on the coroner the first time he testified on direct, or on cross the first time he testified, and he admitted that it could have been due to other causes. It was only on the coroner's rebuttal after your client testified, if I'm correct, that he came through with the most damaging testimony, and that was based on the fact that after your client testified, he said, well, on that testimony, it couldn't have been due to rough sex. He initially said, due to cross-examination, he originally said, yes, that could have been a cause. Then when your client testified, he came back and he said, well, what he said happened couldn't have caused it. Now, that would seem to indicate that the strategy wasn't so bad, it was the testimony that was the problem. No, Your Honor. Jeff Oldsberg's testimony is completely consistent with what our post-conviction experts believe to be the way it all happened. And when asked about rough sex, Jeff denied it. Well, of course he denied it, because what nobody really explained clearly at any point in the trial or at any point in interviewing Jeff is that rough sex, culturally, for people who have that on their radar in their personal world at all, rough sex means whips and chains and violence and stuff. And Jeff was adamant, oh, no, we had no violence in our relationship. Well, they didn't. What they did was erotic asphyxiation, which Jeff didn't know that clinical term either. He called it head rush sex. And Pena, the coroner, had a good time confusing the concepts. In fact, there was even one point in the testimony early on when Pena, when they were, when, and I don't even think we're talking about, I don't even think I'm talking about the rebuttal, but in Pena's direct, when he was, not direct, cross-examination, and defense counsel DeBlanc was cross-examining him and trying to prove it about rough sex. Well, what is rough sex, really? And Pena took it upon himself to start talking and saying, and don't even talk to me about autoerotic sex. I don't want to go there. I'm not a lawyer, which is a really snide, disparaging remark, but that's beside the point. And then, but of course that got DeBlanc's goat and said, oh, you're not a lawyer. Well, you weren't there, were you? And completely missed the point. And meanwhile, Pena succeeded in planting it of diverting anyone from thinking, and plus it wasn't autoerotic asphyxiation. It was erotic asphyxiation. Oh, but. Counselor, you're well over your full time. You wanted to save two minutes, which we'll give you afterwards, but it's now time for the other side. Thank you, Your Honor. May it please the Court. William Frank for Respondent Apelli. Let me address the Richter question up front here. We don't get around Richter. You know, it's Richter held merely because counsel did not retain his own forensic pathologist, did not render his assistance ineffective because he obtained the same information and pursued the same defense via cross-examination of the prosecution's expert. And this Court held in Hump Hall v. Sumner in 1982 that legal assistance is not ineffective for failure to present certain experts if you're able to successfully elicit that information so you could argue it on close. The information that Cartman would have offered if he had taken the stand was the same information that Pena testified, the deputy coroner, when he was cross-examined about Cartman's opinion, that this could have been a fatal cardiac arrhythmia event. Wasn't there more to Cartman? Didn't Cartman criticize the coroner's report because it didn't go fully into the whole cardiac issue and didn't distinguish between heart attack or atrial fibrillation, the different kinds of heart problems that Mr. Campbell was having? The Cartman's post-trial declaration nine years later did. Taking a step back, DeBlank, who was the trial counsel at issue, the second trial counsel for Petitioner, he spoke to Dr. Cartman, got approval for a cardiologist. He met with Dr. Cartman before he rendered his opinion, and when he got the written opinion, he talked to Cartman again. And what Cartman was willing to do in DeBlank's – DeBlank, rather, engage in a thorough investigation of plausible options and were his decisions reasonably informed. He spoke to Cartman, and his testimony at the evidentiary hearing, which is the rare circumstance. We usually don't have trial counsel's strategies, why I decided to use or not use certain experts, or the investigation that I undertook, but we have that here. He spoke to Cartman, and he said, well, Cartman's not willing to say that it was a cause of death was the heart condition. He was more comfortable talking about mathematical probabilities of mortality rates in the general population of those who had similar conditions to Campbell, and that he felt that he really wasn't willing to say that Cartman's – I'm sorry, Campbell's cause of death was from the cardiac condition. And even in the declaration that Your Honor is referring to, he qualifies, he equivocates again saying it could have been a fatal cardiac arrhythmia event. However, but if the coroner finds something else that's subject to qualification to another cause of death, the coroner here did find asphyxiation, you know, compression asphyxiation. So – And was there anything in the coroner's report that would have factually supported the fact that the decedent had a heart attack? I mean, to realize he had heart condition, he had blockages, but there's not a shred of evidence anywhere in any record that I could find, correct me if I'm wrong, that indicates that he had actually died of a heart attack. It's just some possibility, like we could all drop dead of a heart attack. A tentative language, tentative possibility, which is, you know, doesn't render counsel's decision not to use that ineffective. In fact, at the testimony at the evidentiary hearing, DeBlanc said, basically, to make sure I'm accurate, I think it was at Exeter Record 636, there was no evidence in the coroner's report that Carpman was willing to point to that evidenced that there was a cardiac event and that he wanted to generally talk about the mathematical possibilities, probabilities of the general population. But wasn't DeBlanc scared off from using Carpman because the prosecution alleged they had some impeachment that they were going to use? And at that point, didn't DeBlanc have an obligation under Wiggins to check that out, to find out if that impeachment really would have affected DeBlanc's strategic decision to call him or not call him? And I don't find that he did that. Well, Your Honor, let me answer that in two respects. First off, that wasn't the sole reason he chose not to put Carpman on the stand. After he spoke to Carpman and got accurately written opinion, he met with Carpman again. He had, quote, reservations for the reasons I just laid out. So DeBlanc continued his investigation, and he went and met with two forensic pathologists, the deputy coroner and his supervisor. And the deputy coroner was a board-certified age specialist, and considering Campbell is 68, that is significant. And he spoke at length with both coroners. The coroners then conferred, and the deputy coroner said, you know, I'm going to change my opinion as to the cause of death. It's going to be either a homicide asphyxiation, compression asphyxiation, or it could be accidental death due to erotic activity to enhance orgasm. And obviously the contributing factors were testified to by the coroner of the heart condition as well as the alcohol use. Hand in hand, these all went together to cause the death at the end of the day. It wasn't until that point that DeBlanc testifies. He goes, I hadn't made a decision not to use him, but now that I had the, quote, the coroner on my side, unquote, I didn't necessarily need to use the equivocating Cartman. And so his decision, and he did acknowledge that Cartman had wonderful credentials, but he said there was something that I was concerned about that would maybe detract from his opinion. He couldn't recall at his testimony what that was. But, you know, that doesn't mean that I. . . Perhaps there was a question whether he was really teaching at UCLA. No, Your Honor, that's not supported in the record. That isn't? That's argued. Well, I thought that was what his concern was, that perhaps Cartman had embellished his, or at least the state thought that Cartman had embellished his resume. Well, there's language in the appellate briefs to that. I could not find that in the record anywhere. Well, he explains it in his later declaration. He clarifies his role at UCLA. Cartman does? Yes. Yeah, so Cartman. . . What I'm saying is what did Albert de Blanc, the trial counsel, know at the time? Oh, you were talking about Albert de Blanc's comments. Yeah, he didn't. . . He didn't remember. Yeah, he didn't testify. He was asked specifically, what was that? He goes, you know, it's been four years, I can't remember what it was. There's something that puzzles me. Wait, the state court of appeal. . . Yeah. They reversed, or they sent it back for, and appointed a different counsel to make a motion for a new trial and to get expert testimony? Why did they do that? What happened exactly is after Petitioner was convicted, he wrote, per se, a letter to the trial court. I'm not happy with my attorney, de Blanc. And so the trial courts received that letter, and I think there was initial appeal on two issues. I believe it was, if I recall correctly, I think it was the sufficiency of the evidence, and there was a second issue. And before the court of appeal ruled on the two issues, they remanded for a new trial motion hearing with appointment of a different counsel. So the new trial motion could be brought regarding ineffective assistance of counsel, and it was the expert appointment issue. That's when that issue was decided at that hearing. And then I believe that was the first resolution of the first court of appeal decision. So the impetus was Petitioner's dissatisfaction with the degree of his attorney's investigation into possible defenses. And specifically that he thought he should have an expert? Right. He was complaining about that he didn't use enough experts, and the type of experts. He wanted a biomechanical expert. You know, he complained that if he didn't have a cardiologist actually take the stand, who would have been? So I think pro se, Petitioner's complaints were that the representation wasn't thorough enough in the investigation and the choice and use of experts. However, the standard under Strickland is if you've done a thorough investigation, and I will take the court through that, I believe this ineffective assistance of counsel claim is the heart of the case. And it underlies both grounds two and three. The block testified that he was looking not just at the cause of death, but the circumstances underlying the cause of death. So he talked to Dr. Zakaria, who had been retained by previous counsel, and he testified that Dr. Zakaria told him there were several contributing factors to the death, including the heart condition, erotic activity, alcohol use, as well as some mild asphyxia. It was at that point that I believe that DeBlanc consulted with Dr. Cartman, went to the coroner, but he didn't end his investigation there. He looked into the petechia, and whether that could be just from sex or from manual strangulation with homicide at the end of it. He spoke to a number of people, and he testified he spoke to Dr. Zakaria about the petechia, and he himself was familiar with that. So he put all this information together and decided it boiled down to what was petitioner's intent at the time they had sex. And you can infer from DeBlanc's testimony at the evidentiary hearing that the petitioner had told him they had not only had sex, but there was some sort of erotic activity to enhance orgasm. But getting back to a point made earlier, this was almost a case of ineffective assistance of the client, because when the client took the stand to testify, he was given every opportunity. I mean, at some point, if your defense is accidental death due to erotica activity to enhance orgasm that involves manipulating the decedent's neck, you've got to put your hands on the guy's neck. On direct examination, he was taken through a very thorough recounting of the sexual adventure and encouraged to be as open as possible, and they went through all the hand positions. On cross-examination, the prosecutor said, did you harm Mr. Campbell in any way? No. Did you put your hands on his neck and choke him, which is the very definition of erotic activity to enhance orgasm? He said, absolutely not. And then the other issue that doomed Petitioner's case, that did not render ineffective assistance of counsel, was this defense, which was the defense that de Blanc reasonably settled upon after looking at all the facts and doing a thorough investigation, depended upon Petitioner's credibility. And de Blanc didn't stop his representation with the adverse verdict. He took time to speak to the jury. What went wrong? And this is in the evidentiary hearing testimony. The jurors told him once he started talking about using the dead man's credit cards, you know, he lost all credibility. And therein was the fatal flaw with his defense. So Petitioner faults trial counsel for failing to expert shop and otherwise complains of counsel's representation from the incorrect standard of 2020 hindsight rather than one of reasonableness. It's what de Blanc knew at the time after he made his reasonable investigation. And the California Supreme Court's rejection of the claim was objectively reasonable. And just a brief word on the deference due. Yeah, can you comment on the 28-J letters? Because I think you went first and you haven't had a chance to respond to defense counsel's view. Yeah. With respect to, you know, the California Supreme Court issued a summary denial of the habeas petition. Harrington v. Richter was actually decided during the course of this case. So the initial briefing didn't have the benefit of Harrington v. Richter. That is considered a merits denial. However, if there is a procedural bar that's been imposed by a lower court that has not been lifted by the later court, normally, generally, the procedural bar is still in place and the merits haven't been reached. However, in this case, the superior court did not reach the merits of the freestanding ineffective assent as a counsel claim, citing Henry Clark for the premise this was already raised on a direct appeal. You can't re-raise it. However, the California Supreme Court has specifically accepted ineffective assistance of counsel claims, such as in People v. Mendoza Tello, from that procedural bar. And the case that I put before the court was Hinoza, which, in that case, the superior court rejected the or denied the habeas petition for improper venue. The California Supreme Court issued a summary denial, and the United States Supreme Court found that it would have been obvious to the California Supreme Court or the United States Supreme Court that the California Supreme Court had statewide venue and would not have denied it on venue grounds. Same case situation analogous here. The California Supreme Court would not have overruled its own precedent in a silent denial or a summary denial of Henry Clark. And I think I cited a case, a district court case, that had used that in the same sense, Arriaga v. Gonzalez, with an ineffective assistance of counsel claim that had been rejected below by the superior court, citing Henry Clark. You already brought this on direct appeal. And the California Supreme Court issued a summary denial, and the district court there found the California Supreme Court surely knows its own precedent. I see my time has expired. Unless there are further questions, the people otherwise submit on appellee's brief. Thank you, counsel. Your Honor, the case that you mentioned of concern, Harrington v. Richter, it's 131 S. Court 770. And the particular pages to look to to distinguish Harrington from the case at Bar are 770. Page 782 and 789 to 90. The main points in distinction are that the blood spatter issue in Harrington v. Richter was not anticipated early on. Pinpoint page 782 of that decision makes clear that it was pretty much a surprise turn that the prosecution started early in the trial. Trial counsel was not in the position to anticipate that that was specifically what the case was going to be all about. And that is why the Supreme Court found, that's one of the two reasons why the Supreme Court found that it was reasonable of trial counsel to have not consulted with blood spatter evidence, blood spatter evidence experts, but rather to be shooting from the hip, more or less, at that juncture. Because it could not have been anticipated. And what the U.S. Supreme Court, how the U.S. Supreme Court described it at pinpoint page 79 is that from the perspective, quote, from the perspective of Richter's defense counsel when he was preparing Richter's defense, there were any number of hypothetical experts, specialists in psychiatry, psychology, ballistics, fingerprints, tire treads, physiology, or numerous other disciplines and sub-disciplines whose insight might have been useful. Here, de Blanc actually had submitted funding requests that had been granted. Not only was it clear what this case was going to be about and never diverged from that, but de Blanc himself anticipated what the case was going to be about. In de Blanc's mind, he did consult. He did pursue this type of expert when he talked with Zuccaria, but just paid no mind to it when Zuccaria said, oh, no, you need a forensic pathologist, hello. That is a big distinction. All right. You've got two minutes is up. Do you want to wind it up? Okay. To wind it up, I'd just like to add that concerning Kernan v. Inhofe, Kernan v. Inhofe actually supports the case for no-ed pediferance here, and that is because Kernan v. Inhofe affirmed that Ilst holds for a rebuttable presumption for look-through when we have a superior court decision, and then followed by summary denials. In Kernan, that presumption was rebutted because a procedural bar based on venue could not possibly, it's literally impossible, even theoretically, for a procedural problem on venue to be at issue in the California Supreme Court, which is the only court at that level. Okay? Now, yes, we do have Mendoza-Teller, but Mendoza-Teller does not hold categorically in every single case that a habeas petitioner can make successive habeas claims repeatedly without even bringing new evidence. The point of creating the exception to Waltrius by way of Mendoza-Teller is to facilitate the opportunity for new evidence, and in this case in particular, that opportunity was there. This case differs from the norm in that respect. Thank you, counsel. Thank you. Next case for oral argument is United States v. Thompson.
judges: Reinhardt, Wardlaw, Bennett